**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| WILLETTE L.M., [1] | Case No. 5:24-cv-02620-MAA |
|---|---|
| Plaintiff, | **MEMORANDUM DECISION AND ORDER REVERSING DECISION OF THE COMMISSIONER AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS** |
| v. | |
| FRANK BISIGNANO, [2] Commissioner of Social Security, | |
| Defendant. | |

## I.    INTRODUCTION

On December 10, 2024, Plaintiff Willette L.M. ("Plaintiff") filed a Complaint seeking review of Defendant Commissioner of Social Security's ("Commissioner" or "Defendant") final decision denying her application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social

---

[1] Plaintiff's name is partially redacted in accordance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

[2] Frank Bisignano became Commissioner of Social Security on May 6, 2025. Under Federal Rule of Civil Procedure 25(d), he is automatically substituted as Defendant in this suit.

Security Act. (Compl., ECF No. 1.) Pursuant to 28 U.S.C. § 636(c), the parties consented to the jurisdiction of a United States Magistrate Judge. (ECF Nos. 8, 9.) On February 10, 2025, Defendant filed an Answer (Answer, ECF No. 12) and Certified Administrative Record ("AR," ECF Nos. 12-1–12-15). On April 17, 2025, Plaintiff filed a Brief. (Pl.'s Br., ECF No. 17.) On May 16, 2025, Defendant filed a Response Brief. (Def.'s Br., ECF No. 19.) On May 19, 2025, Plaintiff notified the Court that she did not intend to file a Reply Brief. (ECF No. 20.) This matter is fully briefed and ready for decision.

The Court deems the matter appropriate for resolution without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. For the reasons discussed below, the Court reverses the decision of the Commissioner and remands the matter for further administrative proceedings.

## II.     SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On January 16, 2020, Plaintiff filed a Title II application for a period of disability and disability insurance benefits. (*See* AR 166.) On January 31, 2020, she filed a Title XVI application for supplemental security income. (*See* AR 165.) Both applications alleged disability beginning July 19, 2017. (AR 349, 353.) The Commissioner denied these claims initially on December 23, 2020 and upon reconsideration on May 20, 2021. (AR 217–21, 223–28.) On July 10, 2021, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 235.) Plaintiff objected to appearing by video or telephone. (AR 265, 268, 295.) On November 14, 2023, ALJ Elizabeth Watson conducted a hearing, at which Plaintiff testified in person and vocational expert David Rinehart testified by phone. (AR 44–72.) ALJ Marti Kirby conducted a second hearing on May 13, 2024, at which Plaintiff testified in person, and medical expert Darius Ghazi, MD, and vocational expert Jeff Komar testified by phone. (AR 73–117.) On July 10, 2024,

///

2

ALJ Kirby issued a decision finding Plaintiff was not disabled after making the following findings under the Commissioner's five-step evaluation. (AR 17–34.)

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 19, 2017. (AR 19 ¶ 2.) At step two, the ALJ found that Plaintiff had the following severe impairments: "lumbar degenerative disc disease, left sided sciatica, scoliosis, plantar fasciitis, left carpal tunnel syndrome (CTS), left ulnar entrapment at elbow/left ulnar motor neuropathy consistent with cubital tunnel syndrome, left hip bursitis, [and] left iliotibial band syndrome." (AR 20 ¶ 3.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the agency's listed impairments. (AR 22 ¶ 4.) Next, the ALJ found that Plaintiff had the following Residual Functional Capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with the following limitations: Occasionally lift, carry, push, pull up 10 20 pounds and 10 pounds or less frequently. Stand and walk six of eight hours but no more than 10–15 minutes at a time. Sit six of eight hours but needs a sit/stand option (meaning would need a job that could be performed from either a seated position or from a standing position so that he could periodically change positions throughout an eight-hour workday. A change in position would not occur more frequently than 10-15 min intervals. [T]his does not mean that she must change position after every 10-15 minutes but should have the flexibility to do so if needed). Frequent balance, all other postural are occasional except no climbing of ladders, ramps, scaffolds. No work at unprotected heights or around dangerous moving machinery or other hazards. No fast-paced production or assembler line type work (fast paced production is defined as work that require more than frequent use of the hands). Occasionally push/pull with

3

> the lower extremities such as operating foot pedals. Frequent overhead reaching, frequent handling and fingering with the dominant right upper extremity, occasional handling and fingering with the non-dominant left upper extremity.  No jobs requiring acute binocular vision or depth perception.

(AR 23 ¶ 5.)

At step four, the ALJ found that Plaintiff had no past relevant work.  (AR 32 ¶ 6.)  The ALJ concluded Plaintiff had "not been under a disability, as defined by the Social Security Act, from July 19, 2017," the alleged onset date, through July 10, 2024, the date of the ALJ's decision.  (AR 33 ¶ 11.)  Plaintiff filed a request for review with the Appeals Council, which was denied on October 25, 2024.  (AR 1–3.)

## III.   STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the Court reviews the Commissioner's final decision to determine whether the Commissioner's "decision to deny benefits '. . . is not supported by substantial evidence or is based on legal error.'"  *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).  "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1035).  "'Where evidence is susceptible to

more than one rational interpretation,' the ALJ's decision should be upheld." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quoting *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)). "If the evidence can support either affirming or reversing the ALJ's conclusion, [a court] may not substitute [its] judgment for that of the ALJ." *Robbins*, 466 F.3d at 882.

## IV.    DISCUSSION

### A.    Disputed Issues

Plaintiff raises two disputed issues:

1.    Whether the ALJ properly considered the relevant subjective written statements of record and testimony under oath in assessing Plaintiff's residual functional capacity.

2.    Whether the ALJ's findings and conclusions at Step Number Five of the Sequential Evaluation Process Are Supported by Substantial Evidence.

(Pl.'s Br. 4.)

For the reasons discussed below, the Court finds that reversal and remand for further administrative proceedings are warranted for Issue One, based on the ALJ's failure to articulate specific, clear, and convincing reasons for rejecting plaintiff's subjective symptom testimony.  Having found that remand is warranted, the Court declines to address Plaintiff's remaining argument.  *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand."); *see also Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand.").

///

**B.    Applicable Law**

When assessing a claimant's credibility regarding subjective symptom testimony or allegations, the ALJ must engage in a two-step analysis. *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison*, 759 F.3d at 1014 (quoting *Lingenfelter*, 504 F.3d at 1035–36). "In this analysis, the claimant is not required to show 'that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.'" *Id*. (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Id*. (quoting *Smolen*, 80 F.3d at 1282).

If the claimant satisfies this first step, and there is no evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony about the symptom severity. *Id*. at 1014–15; *see also Robbins*, 466 F.3d at 883 ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). The ALJ must evaluate "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the claimant's] ability to perform work-related activities for an adult . . . ." Social Security Ruling 16-3p, 2016 SSR LEXIS 4, at *4 (Mar. 16, 2016).

While the ALJ cannot "delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness," *Trevizo*, 871 F.3d at 678 n.5, the ALJ may

6

consider "prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; . . . unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and . . . the claimant's daily activities," *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1284). Inconsistencies between a claimant's testimony and conduct, or internal contradictions in the claimant's testimony, also may be relevant. *Burrell v. Colvin*, 775 F.3d 1133, 1137–38 (9th Cir. 2014). In addition, the ALJ may consider "the claimant's work record and observations of treating and examining physicians and other third parties regarding, among other matters, the nature, onset, duration, and frequency of the claimant's symptom; precipitating and aggravating factors; [and] functional restrictions caused by the symptoms . . . ." *Smolen*, 80 F.3d at 1284. However, it is improper for an ALJ to reject subjective testimony based "'solely on a lack of objective medical evidence to fully corroborate' the claimant's allegations." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991)).

The ALJ must make "a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002)); *see Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) ("A finding that a claimant's testimony is not credible 'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" (quoting *Bunnell*, 947 F.2d at 345–46)). Although an ALJ's interpretation of a claimant's testimony may not be the only reasonable one, if it is supported by substantial evidence, "it is not [the court's] role to second-guess it." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

7

### C.   Plaintiff's Statements

#### 1.   November 14, 2023 Hearing

Plaintiff testified at two hearings with respect to the instant application for benefits.  During the November 14, 2023 hearing, Plaintiff testified in part as follows:

She last worked in 2017.  (AR 50.)  She stopped working because she was having really severe back pain and could not continue doing her duties at her job.  (AR 47.)  Her job duties had included assisting patients to the restroom and pushing them in wheelchairs, taking them out into the community, sometimes driving them.  (AR 49.)  Her job was part-time, and included doing laundry, vacuuming, and other cleaning tasks.  (AR 53.)

She did not apply for disability until 2020, after her back pain began to impact her life outside work.  (AR 50.)  She was getting really bad burning in her lower back and pain down her leg, cramping in her back, legs, and feet, and burning in her feet.  (AR 48.)  Her back pain radiated primarily into her left leg.  (AR 53.)  Sometimes the pain was so severe that she had to lie down, and at times she felt very fatigued.  (AR 50.)  She would need to rest and put her feet up for 45 minutes and then try to get up and do what she needed to do.  (AR 51.)  Her back was hurting her at the hearing and she asked if she could stand up during the hearing.  (AR 51.)  An epidural injection had been planned, but had not been done by the time of the hearing because Plaintiff's insurance had lapsed.  (AR 53.)

Plaintiff also testified that she was having problems with her hands, wrist, and left elbow.  (AR 55.)  She felt tingling and pain in her hands radiating up her arms; her left side was worse.  (AR 55.)  This impacted her ability to reach with her left arm, and her hand was weak so it was difficult to grab things.  (AR 55.)  She dropped things with her left hand and her ability to type was affected.  (AR 56.)  She had difficulty buttoning clothes.  (AR 56.)

///

8

She also had problems with her feet due to plantar fasciitis. (AR 56.) She had sharp, severe pain in the bottom and top of her feet, which made it difficult to stand up for long periods of time. (AR 56.) She also had osteoarthritis in both knees, which caused problems with standing and made walking painful. (AR 57.) Plaintiff also is, and has always been, nearly blind in her left eye, though she had a driver's license and was still able to drive. (AR 54.)

She testified that she would have difficulties with a job that required her to sit at a workstation for a full day. (AR 57.) She would have to alternate sitting with lying down and putting her feet up. (AR 58.) She did not recall having any days since she stopped working in 2017 where she was able to go all day without lying down. (AR 58–59.) She had good days and bad days, and on a good day she could go to the grocery store, but she could not on a bad day. (AR 59.) She orders delivery from Walmart a lot. (AR 59–60.) On a bad day, she just tries to rest in her recliner with a heating pad. (AR 60.) She has three young kids, but her husband and her sister provide a lot of help taking care of the kids. (AR 60–61.)

### 2.   May 13, 2024 Hearing

During the May 13, 2024 hearing, Plaintiff testified in part as follows:

She was 40 years old, had a high school education, and had not worked since 2017. (AR 85.) Her last job involved watching adults with disabilities. (AR 85.) She would make sure they had lunch, take them out into the community, including driving them places. (AR 86.) Some were in wheelchairs and she would help them to the restroom. (AR 86.) A typical day was mostly half standing and half walking, with maybe 30 minutes of sitting. (AR 86–87.) Though her job title included the word "supervisor," she supervised—i.e., "watched"—her clients, and does not appear to have been a "supervisor" as that term is more commonly used. (AR 85.[3])

_____

[3] (*See also* AR 77 (Plaintiff's counsel's opening statement: "She has a singular past occupation that she did perform for a number of years as a day program worker

9

She stopped working because she could no longer perform her job duties. (AR 88.)  She could no longer lift her clients, push wheelchairs, or be on her feet long enough.  (AR 88.)  She was prevented from doing this by her severe lower back pain, with tingling down her legs, and she needed to take lots of breaks.  (AR 88.)

At the time of the hearing, her pain was a nine on a scale of one to ten.  (AR 90.)  In addition to taking medication (that makes her nauseated and woozy) for the pain, she uses a heating pad.  (AR 89.)  She asked to stand up during the hearing.  (AR 90.)  The heaviest weight she could lift, carry, push, or pull at the time of the hearing was less than ten pounds.  (AR 90.)  Her doctors had not recommended surgery.  (AR 90.)  She had tried physical therapy several times, but did not think that it helped.  (AR 90.)

In the last year, she had not driven anywhere farther away than about five minutes from her house.  (AR 91.)  It was hard for her to stay in the car for long periods of time.  (AR 91.)  She lived with her three children and her boyfriend, whom she sometimes refers to as her husband.  (AR 91–92.)  He helped with the children a great deal.  (AR 92.)  Her youngest child was three and weighed about 40 pounds—too heavy for Plaintiff to lift.  (AR 93.)

Though she stopped work in 2017 she did not apply for disability benefits until 2020.  (AR 93.)  She had enjoyed working, and did everything she could to get better, but the pain was so intense that she felt like she would not be able to return to work.  (AR 93.)

Her left eye blindness had not impacted her ability to work at the adult disability center, and it did not affect her driving during the day, but she did not

---

with special needs patients.  I believe she described that as a day program supervisor.  Upon questioning, she's not really supervising other workers like we think of typically, but rather patients.  She's in a facility where she's working with patients and watching them and helping them . . . .")

10

drive at night.  (AR 93.)  She gets migraines from the glare of a computer screen that prevent her from doing work on a computer.  (AR 94.)  She has migraines every two weeks or so, lasting for about 24 hours, or less if the medication kicks in.  (AR 95.)

She also has scoliosis, and had all three children by caesarean section.  (AR 95.)  Sometimes she would get dizzy if she stood up too fast.  (AR 96.)  She has carpal tunnel that causes pain so severe that once she felt like she was having a heart attack and went to urgent care.  (AR 97.)  That was due to pain in her left hand and arm.  (AR 97.)  She was getting severe pain in her fingers, hands, and running up her arm.  (AR 98.)  She has pain in her right hand also.  (AR 98.)  Her hands are weak and she drops things, and her doctor told her that she had lost mobility [sic] in her hands.  (AR 98.)  Her doctor recommended surgery, but there's no guarantee it will help.  (AR 98.)  She wears braces at night.  (AR 99.)  She has had pain in her feet for years that makes it painful for her stand, walk, or do daily activities.  (AR 99.)  She can only stand or walk for 10–15 minutes before having to sit down for about 30 minutes to rest.  (AR 99.)  She has bursitis in her left hip.  (AR 100.)  This also causes pain and makes walking extremely hard.  (AR 100.)  The heaviest weight she could lift, carry, push, or pull was maybe ten pounds.  (AR 100.)

She had tried acupuncture treatments for the pain in her back, but they did not really help.  (AR 101.)  She took medication for anxiety and depression.  (AR 101.)  She does not feel good when she wakes up in the morning.  (AR 102.)  She does not sleep well because of the pain in her back.  (AR 102.)  She has a cyst on her spine.  (AR 103.)  She has difficulty buttoning her clothes because of the problems she has with her fingers.  (AR 104.)  Her stiff fingers also affect her ability to type, and typing makes her fingers hurt.  (AR 104)  Various family members help her with her children.  (AR 105.)

///

///

11

**D.**   **Analysis**

At the first step of the two-step evaluation, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 24.)  At the second step, however, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.*)  As the ALJ found no evidence of malingering, the ALJ was required to provide specific, clear and convincing reasons for rejecting Plaintiff's subjective symptom statements. *See Garrison*, 759 F.3d at 1014–15.

The Court may review only those reasons that the ALJ specifically cited as grounds to reject Plaintiff's subjective symptom testimony. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) ("We are constrained to review the reasons the ALJ asserts."); *Garrison*, 759 F.3d at 1010 ("We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely.").  Here, the ALJ provided three reasons for discounting Plaintiff's subjective complaints:  (1) inconsistencies between some of Plaintiff's statements, (2) inconsistency of her reported symptoms with her activities of daily living, and (3) lack of objective medical evidence.  (AR 28; Def.'s Br. 3–5.)  The Court reviews each reason in turn.

### 1.   *Inconsistent Statements*

One reason the ALJ gave for discounting Plaintiff's statements regarding her symptoms was the fact that Plaintiff had made what the ALJ characterized as inconsistent statements.  (AR 28.)  The ALJ stated:

> The claimant reported that she did not take care of anyone (see 6E/2).  However, information from the Department of Developmental Services indicated that she

> was "busy raising young daughters," which is inconsistent with her report denying that she provided care for others (2F/7-8, 16-17, 25-26). She reported needing significant help with chores but the information from the Department of Developmental Services indicated that she did chores on her own (see *id.*, 6E/3, testimony). These inconsistencies suggest that some of the claimant's statements about her symptoms and limitations are not entirely reliable.

(AR 28.)

Here, the ALJ put significant weight on Plaintiff's statement "that she did not take care of anyone," when she was actually raising young children. (AR 28 (citing AR 424).) In context, however, this statement is much more ambiguous. The reference is to an Adult Function Report dated March 3, 2020, with which a friend appears to have assisted Plaintiff. (AR 423–30.) In response to the question, "Describe what you do from the time you wake up until going to bed," Plaintiff answered, "get 4 yr. old ready for school. Sometimes return to bed. T.V. talk on telephone. Other times I focus on my pains and other child and physical disability." (AR 424.) The next questions reads, "Do you take care of anyone else such as a wife/husband, children, grandchildren, parents, friend, other?" (*Id.*) To this, Plaintiff checked the "No" box. (*Id.*) After referencing her two children in the previous answer, Plaintiff (or the friend assisting her) may have read this question as asking about anyone other than those previously mentioned. Further, after a question about pets, the form includes a follow-up question: "Does anyone help you care for other people or animals?" (*Id.*) Here, Plaintiff checked the "Yes" box. (*Id.*) To the next question, "If 'YES,' who helps and what do they do to help?," Plaintiff responded, "My play mother who lives directly behind me, my 2 sisters and the children's aunt. Neighbors." (*Id.*) Collectively, the answers provided on this page communicate that Plaintiff has two children that she takes care of, but that she receives assistance in doing so from a number of other people. This is perfectly

13

consistent with her testimony at both hearings. (AR 60–61, 92, 105.) One checkbox checked in error or because the question was misread, surrounded by accurate information, cannot truly be viewed as a material inconsistency in Plaintiff's representations about her children.

The ALJ also points to another purported inconsistency, with regard to Plaintiff's ability to do chores on her own. (AR 28.) The problem appears to stem from reports from the Inland Regional Center ("IRC"), which provides services to individuals with developmental disabilities. Plaintiff, who has been diagnosed with a mild intellectual disability (AR 770), receives an annual Individual Program Plan ("IPP") from the IRC, which appears focused on evaluating her intellectual capacity to live independently outside of an institutional setting and without a conservator or guardian. (*See* AR 778–79, 782.) In this context, it does not appear that the inquiry into her ability to handle chores independently has quite the same meaning as the similar question in the function report form. While it is clear that Plaintiff has the intellectual capability to handle chores, it is also clear that she nonetheless receives assistance from family and friends with many household tasks. (AR 425–26.) Especially given the different purposes behind these forms, the statements in the IRC IPPs that Plaintiff "prepares meals and completes household chores on her own" (*see, e.g.*, AR 776), are not inconsistent with her reported symptoms.

The ALJ also claims that Plaintiff gave inconsistent reports of why she stopped working, asserting that:

> Program plans and evaluation reports of the Department of Developmental Services from after the alleged onset of disability indicate that the claimant took leave from her work due to her pregnancy and was "busy raising young daughters and not interested in working," which is inconsistent with the claimant's report that she stopped working due to back pain and other medical conditions[.]

///

14

(AR 24.) The cited references, however, do not support the claim that Plaintiff "took leave from her work due to her pregnancy," in fact specifically stating that she had to leave her position "due to back pain." (AR 777, 786, 795.) She may not have been interested in immediately returning to work, but the cited records are absolutely clear that the reason she left her prior job was the back pain. Thus, these records do not create any inconsistency that might undermine Plaintiff's credibility.

It is true, of course, that "[a]n ALJ may consider inconsistent statements by a claimant in assessing her credibility." *Popa v. Berryhill*, 872 F.3d 901, 906 (9th Cir. 2017) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001)). "A single discrepancy fails, however, to justify the wholesale dismissal of a claimant's testimony." *Popa*, 872 F.3d at 906–07 (citing *Robbins*, 466 F.3d at 883–84); *see also Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014) (noting that "one weak reason" may be "insufficient to meet the specific, clear and convincing standard" (quotation marks and citation omitted)). Thus, any purported inconsistency in Plaintiff's statements was not a clear and convincing reason, based on substantial evidence in the record, to reject Plaintiff's subjective symptom testimony.

## 2.   *Activities of Daily Living*

Another reason the ALJ gave for discounting Plaintiff's statements regarding her symptoms was Plaintiff's ability to engage in various activities of daily living. (AR 28.) An ALJ may consider activities of daily living in evaluating the intensity, persistence, and limiting effects of a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). "Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination." *Burrell*, 775 F.3d at 1137. However, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work

///

15

environment where it might be impossible to rest periodically or take medication."
*Smolen*, 80 F.3d at 1284 n. 7.

Here, the ALJ discounted Plaintiff's testimony as inconsistent with her activities of daily living, as follows:

> She reported preparing meals daily for up to 4–6 hours (6E/3). She also reported driving and shopping in stores (6E/4). The claimant's apparent ability to take care of young children, her report of doing chores on her own, her report of preparing meals for 4–6 hours, and her ability to drive and shop in stores, generally suggests she is capable of light work. Thus, the evidence of the claimant's activities of daily living suggest she is less limited than alleged and generally supports the residual functional capacity.

(AR 28.)

However, the cited record evidence does not support the conclusions drawn from it.  For instance, the ALJ mentions that Plaintiff had reported "preparing meals for 4–6 hours." (*Id.*)  This sounds as if Plaintiff had reported being on her feet in the kitchen cooking gourmet meals that took 4–6 hours of hands-on preparation time.  In context, however, this report takes on a different significance.  The statement at issue appears at AR 425, in an Adult Function Report dated March 3, 2020, in a section entitled, "Meals."  The first question in this section is, "Do you prepare your own meals?"  Plaintiff responded "yes."  (AR 425.)  To the next question, "If 'Yes', what kind of food do you prepare?  (For example, sandwiches, frozen dinners, or complete meals with several courses.)," Plaintiff responded, "slow cooker, fast food, family brings food, hot dogs, burritos."  (*Id.*)  The next question asks, "How often do you prepare food or meals? (For example, daily weekly, monthly.)"  (*Id.*)  Plaintiff, responded, "Daily."  It was in response to the next question, "How long does it take you?," that Plaintiff stated, "*up to* 4–6 hrs."  (*Id.* (emphasis added).)  The next question reads, "Any changes in cooking habits

16

since the illness, injuries, or conditions began?" (*Id.*)  In response, Plaintiff stated, "I sit a lot to prepare before actually putting it together." (*Id.*)  Thus, in context it is clear that Plaintiff is not spending 4–6 hours cooking every day—or 4–6 hours actively cooking on any day.  None of the listed meals take that kind of time.  Perhaps a meal could take 4–6 hours to cook in a slow cooker, but that is not hands-on cooking time.  If Plaintiff has to rest so much throughout the process that it takes her four hours to make hot dogs, that would support—not undermine—her claims of limited functioning.  Regardless, her statement that it can take "up to 4–6 hours" to prepare a meal does not support the idea that she could perform a job for 4–6 straight hours.

The ALJ also noted that Plaintiff had reported driving and shopping in stores. (AR 28 (citing AR 426).)  As for driving, the cited report does not provide any details about how often or for how long Plaintiff drove.  At the May 13, 2024 hearing, Plaintiff testified that she did not drive at night and in the last year had not driven anywhere farther away than about 5 minutes from her house, as it is hard for her to stay in the car for long periods of time.  (AR 91, 93.)  This minimal level of driving is not inconsistent with her claimed symptoms.

As for "shopping in stores," the cited report actually says the exact opposite. In response to the question, "If you do any shopping, do you shop: (*Check all that apply.*)," Plaintiff checked only the boxes for "By phone" and "By mail," and did not check the box for "In stores."  (AR 426.)  The next question asks, "Describe what you shop for," to which Plaintiff replied, "Groceries at Walmart Pickup – Amazon for more important items." (*Id.*)  Evidently, she either orders for pickup or delivery—and thus, this report provides no support for the idea that Plaintiff physically goes into stores to shop.  Shopping in this fashion is not inconsistent with her claimed symptoms, either.

The ALJ also pointed to Plaintiff's "apparent ability to take care of young children." (AR 28.)  For this, the ALJ relied on a statement in the IRC IPPs

17

discussed above, repeated in three provided reports, that Plaintiff was "raising her two young daughters." As Plaintiff's testimony makes abundantly clear, she is indeed raising young children—three at the time of the hearing—but she receives a lot of help from family and friends in doing so. (AR 60–61, 92, 105.) With help, "raising children" is not inconsistent with her claimed symptoms.

Finally, the ALJ also points to Plaintiff's "report of doing chores on her own." (AR 28.) As discussed in the previous section, this appears to come from the IRC IPPs as well. While it is clear that Plaintiff has the intellectual capability to handle chores, it is also clear that she nonetheless receives assistance from family and friends with many chores. (AR 425–26.)

These activities were not inconsistent with Plaintiff's alleged degree of limitations. *See Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("[T]he mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))); *Ghanim*, 763 F.3d at 1165 ("But here, as described, the daily activities, which included completing basic chores, sometimes with the help of a friend, and attending occasional social events, do not contradict [the claimant's] testimony."). An ALJ may not "improperly cherry-pick[]" evidence. *Ghanim*, 763 F.3d at 1164 (holding that ALJ may not "cherry-pick" evidence that favors disability without considering its context in the record); *see also Garrison*, 759 F.3d at 1017 n.23 ("The ALJ was not permitted to 'cherry-pick' from those mixed results to support a denial of benefits[.]"). For these reasons, the ALJ's rejection of Plaintiff's subjective symptom testimony based on inconsistency with daily activities was not a clear and convincing reason based on substantial evidence in the record.

///

///

18

### 3. *Lack of Objective Medical Evidence*

Finally, the ALJ points to the routine and limited nature of Plaintiff's medical treatment, noting a lack of support for Plaintiff's complaints of pain in her medical records. (AR 28.) It is unquestionably true that an ALJ may consider whether a claimant's subjective symptoms are supported by objective medical evidence, and that an ALJ may reject a claimant's subjective testimony if it is inconsistent with the objective medical evidence. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."). However, while an ALJ may consider lack of medical evidence when analyzing Plaintiff's subjective allegations, "lack of medical evidence cannot form the sole basis for discounting pain testimony." *Burch*, 400 F.3d at 681; *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) ("[A] finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain."); *Bunnell*, 947 F.2d at 345 ("[A]n adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain."); *Robbins*, 466 F.3d at 883 ("While an ALJ may find testimony not credible in part or in whole, he or she may not disregard it solely because it is not substantiated affirmatively by objective medical evidence.").

Defendant acknowledges that "Plaintiff is correct that, alone, a lack of supporting medical evidence is insufficient to discounting a claimant's subjective complaints." (Def.'s Br. 6.) Defendant then argues that, since this is not the sole reason identified by the ALJ, the lack of objective medical evidence, considered together with Plaintiff's inconsistent statements and her activities of daily living, is a sufficient basis for rejecting Plaintiff's subjective complaints. (*Id.*) However, as the other two stated reasons have already been rejected by the Court, the only remaining reason is the lack of objective medical evidence. And standing alone,

lack of objective medical evidence is a legally insufficient reason to support the assignment of little weight to a claimant's subjective symptom allegations. *See Robbins*, 466 F.3d at 883 (where ALJ's other reason to reject the claimant's testimony was legally insufficient, the sole remaining reason premised on the absence of objective medical support could not justify an adverse credibility determination). Thus, this is not a clear and convincing reason, based on substantial evidence in the record, to reject Plaintiff's subjective symptom testimony.

* * *

In sum, the ALJ's decision does not provide specific, clear, and convincing reasons for rejecting Plaintiff's subjective symptom allegations. Reversal is warranted.

### E.    Remand for Further Proceedings

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. *See Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. *See id*. at 1179 ("[T]he decision of whether to remand for further proceedings turns upon the likely utility of such proceedings."). However, where, as here, the circumstances of the case suggest that further administrative review could remedy the Commissioner's errors, remand is appropriate. *See McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011). Specifically, remand is warranted here for reconsideration of Plaintiff's symptom statements regarding her pain because the ALJ's failure to provide legally sufficient reasons for discounting such statements in the decision prevents this Court from meaningfully determining whether the decision is supported by substantial evidence. *See Treichler*, 775 F.3d

at 1103 ("Because 'the agency's path' cannot 'reasonably be discerned,' we must reverse the district court's decision to the extent it affirmed the ALJ's credibility determination." (citation omitted)).

## V.    ORDER

The Court **ORDERS** that judgment be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings.

**IT IS SO ORDERED.**

DATED: March 31, 2026

_____
HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE